## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

BRENDA J. LONIAN,                      )
                                       )
                 Plaintiff,            )
                                       )
v.                                     )        Case No. 11-CV-728-PJC
                                       )
CAROLYN W. COLVIN, Acting Commissioner )
of the Social Security Administration,[1] )
                                       )
                 Defendant.            )

## OPINION AND ORDER

Claimant, Brenda J. Lonian ("Lonian"), pursuant to 42 U.S.C. § 405(g), requests judicial

review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying her applications for disability benefits under the Social Security Act.

In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a

United States Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit

Court of Appeals.  Lonian appeals the decision of the Administrative Law Judge ("ALJ") and

asserts that the Commissioner erred because the ALJ incorrectly determined that she was not

disabled.  For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Administrative Hearing

Lonian was almost 54 years old at the time of the hearing before the ALJ on March 9,

2010.  (R. 26, 132).  She testified that she could only read and write a little bit.  (R. 48).  Lonian

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting
Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as
Defendant in this action. No further action need be taken to continue this suit by reason of the
last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

had previously worked as a mail sorter, as an assembly packer, as a janitor, and in home health care.  (R. 33-37).  She testified that she was terminated from her last position in home health after being "written up" for falling asleep on the job and for patients allegedly lying about her.  (R. 37-38).  Lonian testified that she was no longer able to work due to diabetes, foot and back pain, depression, and anxiety.[2]  (R. 39-40, 42-43, 49).

Lonian testified that she had problems with her memory and her ability to focus.  (R. 48-49).  She estimated that the severity of those symptoms was fairly new and had interfered with her ability to work for the last 6-7 months.  (R. 50).  Lonian also testified regarding her history of using and selling illegal drugs.  (R. 51-55).  She testified that she had last used cocaine two months prior to the hearing, at which time she was using "no more than a twenty" "every other day."  (R. 52).  She acknowledged she still had a problem, and would use when the occasion would arise, but that she had cut back her usage because she could not afford it.  (R. 53-55).

At the hearing, Lonian's counsel indicated he had a "hunch" that there was a 12.05(C) issue,[3] and was attempting to obtain Lonian's school records to determine whether Lonian had been in special education classes.  (R. 30, 32, 61).  Counsel stated that depending on what the

---

[2] Lonian's appeal relates solely to her IQ and the ALJ's failure to order IQ testing. Plaintiff's Opening Brief, Dkt. # 27.  The undersigned has not summarized records included in the administrative transcript that do not relate to this issue, such as her diabetes, skin abscesses, physical pain, or hypertension because those records are irrelevant to the narrow issue Lonian has raised on appeal.  Lonian's alleged depression and anxiety are also not an issue on appeal, but the undersigned has included a partial summary of Lonian's mental health records, to the extent it reflects on her mental status.

[3] Counsel was indicating his belief that Lonian "may or may not" have mental retardation.  20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.05(C).  (R. 32).

2

school records indicated, Wechsler Intelligence Scales for Children ("WISC")[4] testing may be appropriate.  (R. 32, 61).  However, counsel did indicate his confidence that Lonian adequately understood the issues.  (R. 31).  Subsequently, counsel was informed by the school district that no records or information pertaining to Lonian could be found.  (R. 207-15).  Despite this, counsel still requested, in writing, the ALJ order a psychological consultative examination and formal Wechsler Adult Intelligence Scale ("WAIS") testing.  (R. 211).

### Medical Evidence of Record

Lonian's medical records reflect treatment pertaining to her poorly-managed diabetes, hypertension, and diabetic cellulitis/ulcers/abscesses, and other routine medical care from approximately March 2007 through May 2010.  (R. 222-338, 354-484, 521-86, 679-707, 732-34).  None of these records gave any indication that Lonian had mental retardation, or any other abnormal mental status, and most of them also indicated Lonian's denials of depression, anxiety, or any other mood/mental disorder.  *Id.*

On May 11, 2009, Lonian presented to Sarah Land, D.O., at Family & Children's Services ("F&CS") for an initial Psychiatric Diagnostic Evaluation.  (R. 658-69).  Lonian's primary complaints were "sleep and pain."  (R. 658).  She explained that her anxiety and depression were related to her "situation" of being unemployed, being in pain, and having been "busted" for selling illegal drugs.  *Id.*  Lonian reported that she had an 8th grade education.  *Id.*  Dr. Land noted Lonian was "moody," had average intellect with little education, and had logical,

---

[4] A WISC test is a standardized, individually administered IQ test given to children. *See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 41 (Text Revision 4th ed. 2000) (hereinafter "*DSM IV*").

3

normal speech.  *Id.*  Dr. Land diagnosed Lonian on Axis I[5] with major depressive disorder, cannabis dependency, and a history of cocaine abuse.  (R. 659).  She assessed Lonian's Global Assessment of Functioning ("GAF")[6] as 50.  *Id.*  Dr. Land prescribed Celexa and trazodone.[7]  *Id.*

Lonian returned to FC&S on August 4, 2009 and reported that the trazodone had helped. (R. 660-61).  However, Dr. Land noted that although it had been 3 months since her last visit, Lonian had not gone through even a 30-day supply of her Celexa.  (R. 660).  Dr. Land noted that Lonian had a euthymic mood, congruent affect, adequate attention/concentration, and average judgment/insight.  *Id.*  She stressed medication compliance and continued her medication.  *Id.*

Lonian continued to be seen at FC&S by Dr. Land and by Samantha Brownell, BA, CCMC, through July 2010.  (R. 662-78, 721-30).  During this time, she continued to complain of depressive symptoms, physical health problems, and financial difficulties.  *Id.*  She also reported noncompliance with her prescribed medication, as well as ongoing drug use, though her use had decreased because she could not afford it.  (R. 662, 672-75).  However, Lonian did report that "if [she] had the money [she] would be doing it a lot because [so] much is going on [she] would try to make [her]self feel better."  (R. 672-73).  During these appointments, spanning several months, neither Dr. Land nor Ms. Brownell noted any problems with Lonian's intellect or questioned whether Lonian had mental retardation.  (R. 657-78, 721-31).

---

[5] The multiaxial system "facilitates comprehensive and systematic evaluation."  *DSM IV* 27.

[6] The GAF score represents Axis V of a Multiaxial Assessment system.  *See DSM IV* at 32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning."  *Id.* at 32.  The GAF scale is from 1-100.  A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning."  *Id.*

[7] Celexa and trazodone are anti-depressants.  *www.pdr.net.*

4

After the ALJ had rendered her decision, Lonian was referred by her attorney to Lindsey

Brooks, Psy.D., for an evaluation on November 4, 2010.  (R. 737-41).[8]  Lonian reported

symptoms of depression, primarily related to financial problems.  (R. 737, 741).  Lonian reported

to Dr. Brooks that she had not done well in school and had been in speech therapy and special

education.  (R. 738).  She reported that she was often suspended and dropped out of school

during her 7th grade year.  *Id.*  She did not have her GED, but did report that she got a vocational

welding degree.  *Id.*  She reported ongoing problems with reading and comprehension.  *Id.*  In

describing her work history, Lonian reported her first job was working at a factory for one year;

then for 16 years she was a driver and cleaned houses for her "sugar daddies;" she then worked

for over three years at a cabinet factory; then supported herself for two years by selling drugs;

and last worked in home health for three years.  *Id.*  Lonian reported that at the time, she was

only using cocaine once every two months, though she had used it on a weekly basis in the past.

(R. 739).

Dr. Brooks administered the WAISS, which showed a full scale IQ of 62, indicating

general intelligence in the mentally retarded range.[9]  (R. 740-41).  Problem-solving speed was in

the borderline range, but nonverbal reasoning, verbal comprehension, short-term memory, and

---

[8] This Court has included all evidence submitted subsequent to the ALJ's decision in its consideration of whether substantial evidence supports the ALJ's determinations.  "We must [ ] consider the entire record, including [the newly submitted] treatment records, in conducting our review for substantial evidence on the issues presented."  *Martinez v. Barnhart*, 444 F.3d 1201, 1208 (10th Cir. 2006).

[9] An IQ level of 62 falls within the range of mild mental retardation, which used to be referred to as "educable."  *DSM IV* at 42-43.  An adult with mild mental retardation can typically achieve social and vocational skills adequate for minimum self-support.  *Id.*  The diagnosis of mental retardation requires the onset of the disorder be before 18-years old.  *Id.* at 47.

attention were all within the mentally retarded range.  *Id*.  Lonian's weakness was in the area of

word knowledge, and her strength was in the area of spatial analysis and synthesis.  *Id*.  Dr.

Brooks noted that Lonian appeared to be putting effort into the tasks, and therefore she

considered the testing to be a valid representation of her functioning.  (R. 739).  In her

conclusion, Dr. Brooks commented:

> Based upon the opinion of this examiner and clinical findings, Ms. Lonian's
> emotional disturbance is not of the severity and magnitude sufficient enough to
> interfere with her ability to consistently perform daily tasks, and preclude her
> from performing an occupation.  The client does show cognitive deficits, which
> would limit her ability to perform in some occupations.  However, in the past the
> client has performed steadily in factory work for years at a time, on more than one
> occasion.  It is noteworthy that the client admitted to continued use of crack
> cocaine when it is available to her (about once every two months).  The client
> may have more success in an occupation, if she were able to discontinue her drug
> habit.

(R. 741).

## Examinations and Reports by Agency Consultants

Agency consultant Joel Justin Hopper, D.O., conducted an examination of Lonian on

May 18, 2009.  (R. 487-93).  Lonian reported that her diabetes caused discomfort, numbness, and

tingling in her feet and lower legs, and that she had a history of lesions and abscesses requiring

removal.  (R. 487).  Lonian also reported feeling "moody and crie[d] all the time."  *Id.*  Dr.

Hopper noted that Lonian was cooperative, intelligible, and appeared to have normal thought

processes.  *Id.*  Upon examination, Lonian moved all extremities well, had a full range of motion

and did not experience any pain during testing.  (R. 488-92).  Straight leg raises were negative in

the seated and supine positions and toe and heel walking was normal bilaterally.  (R. 488-89).

Lonian ambulated with a stable gait at an appropriate speed, and without the use of assistive

devices.  *Id.*  Lonian did have multiple abscesses in her lower legs, in varied stages of healing;

6

on her feet, there was callousing, but there were no appreciable abscesses.  (R. 488).  Dr. Hopper indicated that Lonian had normal grip strength, could pick up and manipulate paperclips without difficulty, could effectively oppose her thumbs to her fingertips, manipulate small objects, and effectively grasp tools. (R. 488, 492).  Dr. Hopper assessed Lonian with insulin-dependant diabetes mellitus, hypertension, depression, and a history of abscesses.  (R. 488).

Non-examining agency consultant Kenneth Wainner, M.D., completed a Physical Residual Functional Capacity Assessment on June 3, 2009.  (R. 495-502).  Dr. Wainner determined that Lonian could occasionally lift and carry 20 pounds, and frequently lift and carry 10 pounds; that she could stand and walk for about 6 hours in an 8-hour work day; that she could sit for a total of 6 hours in an 8-hour work day; and that she had no restrictions on pushing and pulling.  (R. 281).  Dr. Wainner also determined that there were no postural, manipulative, visual, communicative, or environmental limitations established. (R. 497-99).  In support of these opinions, Dr. Wainner noted Lonian's history of poorly controlled diabetes, resulting in multiple abscesses, her ability to complete all activities of daily living, and he summarized Dr. Hopper's examination.  (R. 496-97).  Dr. Wainner specified that he considered Lonian's pain in forming his opinions, which was the main factor in the assessed limitations.  (R. 497).

Agency consultant Jeri Fritz, Ph.D., conducted a mental status examination of Lonian on June 15, 2009.  (R. 503-06).  Lonian reported to Dr. Fritz that the primary hindrance to employment was her diabetes, as it was the source of pain and of her depressed affect.  (R. 503, 505).  Lonian reported that as a child, she rarely went to school, earned poor grades, but had completed 9th grade.  (R. 503).  Lonian described difficulty with her academic work due to difficulty pronouncing words and ridicule by her peers; she denied having ever been suspended

or expelled.  *Id*.  Lonian also described a history of childhood physical and sexual abuse, her

drug and alcohol use, her legal problems and incarceration, and having gone through a substance

abuse program.  (R. 503-04).  She recounted that she managed her own money and was able to

perform her own activities of daily living.  (R. 504).

Dr. Fritz noted that Lonian's attention and concentration were within normal limits, she

had a "range of appropriate affect," was alert and oriented, and evidenced no psychotic thoughts.

(R. 504-05).  Dr. Fritz estimated Lonian's intellect within the borderline average range of

functioning.  (R. 504).  She also found that Lonian's registration and long-term memory

appeared within normal limits.  *Id*.  Lonian did demonstrate a low awareness of social norms and

conventions, and she had limited insight.  (R. 504-05).  Dr. Fritz opined that Lonian could

understand, retain, and follow directions and could perform simple, repetitive tasks.  (R. 505).

Dr. Fritz found Lonian's ability to relate to others and her ability to handle stress of daily

interactions as fair.  *Id*.  Lonian's score on the Folstein Mini-Mental Status exam did not suggest

organic impairment.  *Id*.  Dr. Fritz's diagnosis was dysthymic disorder.[10]  (R. 237).  She assessed

Lonian's GAF as 65.[11]

On June 17, 2009, Dorothy Millican-Wynn, Ph.D., a nonexamining agency consultant,

completed a Psychiatric Review Technique form and opined that Lonian did not have a severe

mental impairment.  (R. 507-20).  In reaching this opinion, Dr. Millican-Wynn considered

---

[10] Dysthymic disorder is characterized by a chronically depressed mood for at least two years.  *DSM IV* at 376.

[11] A GAF score between 61-70 indicates "some mild symptoms" or "some difficulty in social, occupational, or school functioning. . . , but generally functioning pretty well, has some meaningful interpersonal relationships."  *DSM IV* at 34.

Listing 12.04, pertaining to affective disorders and Lonian's depressive symptoms of sleep disturbance and difficulty concentrating and thinking.  (R. 507, 510).  She also took into consideration Listing 12.09, noting Lonian's history of drug use, which was allegedly in remission.  (R. 507, 515).  For the "Paragraph B Criteria,"[12] Dr. Millican-Wynn assessed Lonian with mild limitations in her activities of daily living, in maintaining concentration, persistence or pace, and in difficulties in her social functioning.  (R. 517).  Dr. Millican-Wynn noted Lonian had experienced no episodes of decompensation.  *Id.*  In the "Consultant's Notes" portion of the form, Dr. Millican-Wynn reviewed Lonian's report of symptoms and briefly summarized Dr. Fritz's report.  (R. 519).  Dr. Millican-Wynn noted that Lonian "appeared mostly limited by her physical pain conditions and problems with ambulation.  Mental [impairment] appears to be nonsevere currently."  *Id.*

### Procedural History

On August 12, 2008, Lonian protectively filed applications for Title II disability insurance benefits and Title XVI supplemental security income benefits, under the Social Security Act, 42 U.S.C §§ 401 *et seq.*  (R. 12, 132-41).  Lonian alleged the onset of her disability began March 15, 2008, and affirmatively represented that she was not disabled prior to age 22.  (R. 12, 132, 139).  Lonian's applications for benefits were denied initially and upon reconsideration. (R. 64-67).  A hearing before ALJ Deborah L. Rose was held on March 9, 2010

---

[12] There are broad categories known as  the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; Listing 12.00(C).  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

in Tulsa, Oklahoma.  (R. 26-63).  By decision dated June 24, 2010, the ALJ found that Lonian

was not disabled.  (R. 14-22).  On September 22, 2011, the Appeals Council denied review of the

ALJ's findings.  (R. 1-7).  Thus, the decision of the ALJ represents the Commissioner's final

decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[13]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[13] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the Commissioner's decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.* (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Commissioner

The ALJ determined that Lonian met insured status through March 31, 2012.  (R. 14).  At Step One, the ALJ found that Lonian had not engaged in substantial gainful activity since March 15, 2008, the alleged onset date of her disability.  *Id.*  At Step Two, the ALJ found that Lonian had severe impairments of diabetes mellitus with peripheral neuropathy, obesity, and a history of multiple abscesses.  *Id.*  At Step Three, the ALJ found that Lonian's impairments, or combination of impairments, did not meet the requirements of a Listing.  (R. 16).

After reviewing the record, the ALJ determined Lonian had the RFC to perform a full range of light work.  *Id.*  At Step Four, the ALJ found that Lonian was capable of performing

11

past relevant work as a mail sorter and assembly packer.  (R. 19).  In the alternative, the ALJ

found that Lonian was not disabled at Step Five and identified other jobs in the national

economy that Lonian could perform, taking into account her age, education, work experience

and RFC.  (R. 19-20).  Therefore, the ALJ found that Lonian was not disabled from March 15,

2008 through the date of her decision.  (R. 21).

After specifically taking into consideration the new evidence submitted by Lonian,

namely, Dr. Brooks' evaluation, the Appeals Council denied review of the ALJ's findings,

noting that there was no evidence to support onset before age 22, as required by the Listing

12.05(C).  (R. 2).

**Review**

Lonian asserts the ALJ erred in failing to fully develop the record by refusing to order an

additional consultative examination with IQ testing.  Lonian also asserts that in light of new and

material evidence, her IQ testing by Dr. Brooks, she should be found to be disabled at Step

Three.  Because the undersigned finds that the Commissioner's decision is supported by

substantial evidence and satisfies legal requirements, the Commissioner's decision is affirmed.

**Development of the Record**

Lonian's first argument is that the ALJ failed to fulfill her duty to develop the record in

that she ignored counsel's request to have additional consultative examinations done, including

IQ testing.  At the hearing, Lonian's counsel indicated he was waiting to receive Lonian's school

records to see whether she had been in special education classes.  (R. 30, 32, 61).  If those

records gave "any basis for [counsel] to allege" mental retardation or indicated IQ testing would

be appropriate, he would then request another consultative examination with IQ testing.  (R. 30,

12

32, 61).  The ALJ acknowledged the request, stated she would keep the record open to receive the school records, and would take the request under advisement, depending on what was reflected in the school records.  (R. 30, 61).  Although unsuccessful in obtaining Lonian's school records, counsel requested an additional consultative examination with WAIS testing.  (R. 211).

An ALJ "has a basic duty of inquiry to fully and fairly develop the record as to material issues."  *Baca v. Dept. of Health & Human Servs.*, 5 F.3d 476, 479-80 (10th Cir. 1993).  However, the ALJ has "broad latitude" in ordering consultative examinations and "does not have to exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning.  The standard is one of reasonable good judgment."  *Hawkins v. Chater*, 113 F.3d 1162, 1166-67 (10th Cir. 1997).   The ALJ may rely on a claimant's counsel to identify an issue requiring development, "but that issue must also be 'substantial' 'on its face.'"  *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009) (*quoting Hawkins*, 113 F.3d at 1167).  It is the claimant's burden to ensure there is sufficient evidence suggesting a "reasonable possibility that a severe impairment exists."  *Wall*, 561 F.3d at 1063 (quotation omitted).

In *Hawkins*, the Tenth Circuit summarized three instances in which a consultative examination might be required: (1) when there is a direct conflict in the medical evidence; (2) when the medical evidence is inconclusive; and (3) when additional tests are required to explain a diagnosis already contained in the record.  113 F.3d at 1166-70.  Lonian does not make clear which of these instances required the additional mental consultative examination that she requested here.  Other than Lonian's counsel's "hunch" that Lonian "may or may not" have mental retardation, Lonian does not point to *any* particular record that suggested the ALJ needed to develop the record further.  (R. 32).  This "hunch" falls far short of meeting the burden of

presenting a "substantial" issue "on its face" that suggests "a reasonable possibility" that Lonian had mental retardation.  *Wall*, 561 F.3d at 1062-63.

Other than describing a limited ability to read and/or write, Lonian, herself, never indicated that her mental intellect precluded her from working.  (*See e.g.*, R. 155, 179, 487, 737-38).  In her application, Lonian specifically denied having been in special education classes[14] and though Lonian did not complete high school, it is unclear from the record how much schooling she did actually receive.[15]  (R. 160).  *None* of Lonian's medical records, spanning approximately three years, indicated she had mental retardation or suggested a possibility of retardation.  (R. 222-338, 354-484, 521-86, 679-707, 732-34).

Lonian, did, in fact, receive a consultative examination by Dr. Fritz prior to the hearing before the ALJ.  (R. 503-06).  The results of this evaluation, and multiple other valid reasons were the basis of the ALJ's denial of the request for an *additional* evaluation and IQ testing.  (R. 18).  The ALJ cited Dr. Fritz's evaluation, and her finding that there was no evidence of organic impairment, and her opinion that Lonian could perform simple repetitive tasks and that she had the ability to interact with others.  (R. 18, 505).  Dr. Fritz specifically considered Lonian's intelligence and opined that she was within the borderline average range of functioning.  (R. 504).  The ALJ also relied upon the opinion of Lonian's own treating psychiatrist, Dr. Land, that though Lonian had little education, she was of average intellect.  (R. 18, 658).  Dr. Land had also indicated Lonian had logical speech, adequate attention/concentration, and average

---

[14]  The first time Lonian ever indicated that she had been in special education classes was at her evaluation with Dr. Brooks.  (R. 738).

[15] Lonian reported various amounts of education: i.e., dropped out of school in 7th grade, completed 8th grade, and completed 9th grade.  (R. 160, 503, 658, 727, 738).

judgment/insight.  (R. 658, 660).  The ALJ also considered the fact that Lonian had done semi-skilled work, and performed other tasks indicating her intellect was not as limited as her counsel alleged.  (R. 18-19).  Evidence of the ability to perform such work is inconsistent with mental retardation and is an appropriate consideration.  *Bland v. Astrue*, 432 Fed.Appx. 719, 723 (10th Cir. 2011) (unpublished) (*citing Cox v. Astrue,* 495 F.3d 614, 619 (8th Cir. 2007)).  *See also Crane v. Astrue,* 369 Fed.Appx. 915, 921 (10th Cir. 2010) (unpublished).

Given the "broad latitude" of the ALJ in ordering consultative examinations, the fact that Lonian did receive a consultative examination, that the only evidence suggesting that Lonian "may or may not" have mental retardation was counsel's "hunch," and the specific reasons provided by the ALJ for denying additional evaluations, the undersigned finds no error in the ALJ's duty to develop the record and failure to order an additional consultative examination with IQ testing.  *Hawkins*, 113 F.3d at 1166.

**Step Three and Listing 12.05(C)**

Lonian asserts that the evaluation and IQ testing completed by Dr. Brooks is evidence that she meets the requirements of Listing 12.05(C) and that she should be found disabled at Step Three.  In order to meet the requirements of Listing 12.05(C), Lonian must demonstrate:

> . . . significantly subaverage general intellectual functioning with deficits in adaptive functioning *initially manifested during the developmental period; i.e. the evidence demonstrates or supports the onset of the impairment before age 22* [and]
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (emphasis added).  Lonian urges that the IQ testing completed by Dr. Brooks demonstrated she met the first criteria (full scale IQ of 62), and that

any of the other severe impairments found by the ALJ would satisfy the second criteria of an additional physical or mental impairment significantly limiting her functioning.  Plaintiff's Brief, Dkt. # 27, p. 8.  Meeting solely the requirements of prong C, however, is insufficient; claimants must *also* meet the requirement set forth in what is referred to as the "capsule definition" of this listing, such as evidence that the intellectual deficits manifested before age 22, during the developmental period.  *Wall*, 561 F.3d at 1062; *Lax v. Astrue*, 489 F.3d 1080, 1085 (10th Cir. 2007).

Although the ALJ did not address Listing 12.05(C) and did not have Dr. Brooks' report for consideration, the Appeals Council did.  The Appeals Council specifically considered Dr. Brooks' report and made it a part of the record.  (R. 1-7).  There is no requirement that the Appeals Council give a specific analysis of new evidence.  *Martinez*, 389 Fed.Appx. at 868-69 (finding it sufficient for the Appeals Council to explicitly state that it considered the evidence).  However, in this case, the Appeals Council stated that it specifically considered Dr. Brooks' report, Lonian's IQ score, and its application to Listing 12.05(C).  (R. 2).  The Appeals Council found that even with Dr. Brooks' assessment, Lonian could not satisfy Listing 12.05(C) because there was no evidence meeting the capsule definition, which required evidence of onset before age 22.  *Id*.  The Appeals Council's analysis is now part of the administrative record for this Court to consider when evaluating the Commissioner's decision for substantial evidence.  *Martinez*, 389 Fed. Appx. at 868-69; *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994); *Blea v. Barnhart*, 466 F.3d 903, 908 (10th Cir. 2006).  Therefore, the real issue before the Court is whether the record, including the opinion of Dr. Brooks and the analysis provided by the Appeals Council, still contains substantial evidence to support the decision of the ALJ.

*Martinez*, 389 Fed. Appx. at 869. *See also Bland*, 432 Fed.Appx. at 722 (finding no error in

ALJ's failure to address Listing, despite inability to employ customary review process).

In order for Lonian to satisfy Listing 12.05(C), she must demonstrate that she meets the

requirements of the listing's capsule definition, part of which requires evidence of onset before

age 22 (during the developmental period), as well as severity prong (C).[16]  *Wall*, 561 F.3d at

1062 (*citing Lax*, 489 F.3d at 1085); *see also DSM IV* at 41, 49 (diagnosis requires proof of onset

before age 18).  Even assuming that she has satisfied prong (C) with Dr. Brooks' evaluation and

IQ testing, there is no evidence of record that Lonian can satisfy the basic requirement of Listing

12.05.  As discussed above, Lonian herself, never alleged that she suffered from any intellectual

deficits, other than some difficulty with reading and writing.  Lonian specifically denied onset of

any disability prior to age 22, and at one point, denied taking special education classes in school.

(R. 139, 160).  Though Lonian does have a limited education, this does not demonstrate Lonian

had mental retardation before age 22.  *See Wall*, 561 F.3d 1048 (IQ score of 67, completed

9th/10th grade); *Lax*, 489 F.3d at 1082-83 (IQ score of 57 and 10th grade education consisting

mostly of Ds and Fs); *Bland*, 432 Fed.Appx. at 723 (IQ score of 67 and 10th grade education

with low grades).  Even if there was evidence that Lonian had taken special education classes,

which Lonian has provided inconsistent accounts of, and which is not of record, this would be

insufficient to satisfy the capsule definition.  *See Lax*, 489 F.3d at 1082, 1088 (school records

that confirmed poor grades, claimant's enrollment in "LR," "LD," and "Dev" courses, and

claimant's repeating class multiple times was substantial evidence of learning disability rather

than mental retardation); *Bland*, 432 Fed.Appx. at 723 (declining to adopt a presumption of

---

[16] Lonian made no argument that she could satisfy any severity prong other than prong C.

mental retardation before age 22 based upon a later IQ score).

Because there is no evidence in the record that indicates Lonian exhibited signs of mental retardation before age 22, as required by Listing 12.05, Dr. Brooks' report[17] and IQ testing does not affect the decision of the ALJ, which remains supported by substantial evidence, as explained by the Appeals Council.

**Conclusion**

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED**.

Dated this 20th day of March, 2013.

Paul J. Cleary
United States Magistrate Judge

---

[17]  Tellingly, even Dr. Brooks opined that Lonian's cognitive defects would not preclude her from performing an occupation, as evidenced by Lonian's ability to perform work steadily for years at a time, on more than one occasion.  (R. 741).